Chamberlain v. Chamberlain, 523-0288, the appellant is Ms. Campanella. I'm sorry, Your Honor? You're the appellant? Yes, Your Honor. And I can't read the name of the sign-in. For? For the appellate. William Asa. Okay, thank you, Mr. Asa. I'm sorry, Your Honor, Mr. Chamberlain is here to make that as the signature of the treaty. Okay. You're right about that. Just give me a minute. Okay, yes, you may. Are you ready? Yes. Yes? Okay. Just while she's ready? Okay. When you're ready, Ms. Campanella. And is that your client who's here today? No, my client is not here today, Your Honor. Okay, so Mr. Asa's client is here. Okay, very good. Thank you. Just wanted to make sure the record reflected that. Yes, Your Honor. Okay. May it please the court opposing counsel, I'm Winter Campanella, and I represent Jeannette Lynn Chamberlain, the appellant. Your Honor, this matter, Your Justice, as this matter is before you today, with regard to the big issue, was whether or not a post-factual agreement was valid. The trial court found that it was procedurally and substantively unconscionable. In addition, it found that Lynn violated the terms of the agreement and, therefore, refused to enforce it. I know you all know the facts, so I'm not going to go into that. But if you have any factual questions, feel free to ask me. With regard to the validity, I relied on several cases in my brief. I'm not going to summarize all of them, but one of the ones that I did want to kind of rely upon today is In Re, the Marriage of Prill. In the Prill case, which is a First District case, and as you all know, the standard of review, these are all very factual, and you all get to review this de novo because it's whether or not a contract is valid. So in the factual findings of the trial court, as stated in Prill, you all can only overturn those or reverse those if it's against the manifest way to the evidence.  With regard to Prill, so in Prill, husband and wife are married. Husband drafted a post-nuptial agreement. Wife, who didn't have a career, was kind of a caretaker of the home, was to have no maintenance under the agreement. The parties had five investment properties.  She received a $4,000 a month payment for like other payment, not necessarily maintenance for 60 months. Everyone had to keep their own investments, but wife didn't have any investments. Husband got to keep all of the joint investments, stock in his company. Wife files for dissolution of marriage. Husband files to enforce the post-nuptial agreement. And wife says, hey, this post-nuptial agreement isn't valid. He said he was controlling during the course of our marriage. I had no access to accurate information about our finances. He told me he was going to keep the children from me. He was going to drag this out. This was going to be a horrible ordeal, so I signed the agreement. The first district said the agreement's valid. The agreement is valid. All of those things, summarizing, don't matter. They don't rise to the level of procedural unconscionability. Now, taking a look at the case here, as you all can see from the record in the Chamberlain matter, the parties were married back in the 80s. In 2011, they separated, and a divorce case was filed in Saline County. Mr. Chamberlain moved to Texas, and he eventually, with some health issues, ends up in a nursing home. I do want to bring to the court's attention, because I believe this is very important, at no point during the trial, which I was not the trial attorney, but at no point during the trial is there any testimony about the conditions of the nursing home in Texas. There are nice facilities all over this country and world, but that's important because of the trial court's ruling with regard to the procedural unconscionability. So Mr. Chamberlain is in a nursing home in Texas, going through as an attorney in his divorce case in Saline County, has called up to Illinois to speak with Lynn, my client, and says, I would like to come back to Illinois. I'll sign over the marital residence to you. She contacts her lawyer, her lawyer drafts the postnuptial agreement, sends it off to his lawyer, and eventually everybody signs it, and Gerald, or Mr. Chamberlain, comes back to Illinois and resides in the home in Saline County for nine years. All of that, the formation of the agreement, was his idea. What he got out of it was to come back to Illinois and have his wife be a caretaker for him. Now the appellee argues that, well, there was no test, you know, there was the daughter and the son-in-law and Doris caretakers taking care of him, but Lynn lived there and those people didn't live in the home. So overnight, any caretaker duties he would need would be provided by Lynn. So, we have, in the proof case, it was the husband who drafted the agreement, the husband's idea, and the husband threatening the wife, and it was still deemed procedurally valid. In this case, the agreement was the husband's idea, the wife's attorney drafted it, presented it to his lawyer, and now the trial court says, well, it's procedurally invalid because he had no meaningful choice, because he was in a nursing home. The trial court did not pursue it to prill. The validity of the agreement is to be presumed. The validity of the agreement in this case was to be presumed valid. That presumption was not carried out in the trial court. How do I know that? Well, if you take a look at the judge's entry or the judge's ruling in the judgment of dissolution of marriage, he just says, he assumes, how can Mr. Chamberlain have any other choice? He was in a nursing home. There was no evidence as to the condition of the nursing home, and he says, you know, he questions his cognitive ability, and there was no evidence that Mr. Chamberlain had any issues with his cognitive function, and it had been two years, or not, sorry, ten years in lieu of the past, because by the time this went to trial, it was, I think, 2022, 2023 timeframe. And so there was no evidence that he didn't have the cognitive ability to enter into this agreement. There was no evidence that this nursing home was somehow a horrific place, thereby leaving Mr. Chamberlain no meaningful choice. But the judge, the trial court judge, with all due respect, made an erroneous finding and found that the agreement was procedurally unconscionable. Counsel, is there anybody that would choose a nursing home over their own house? If you're going through a divorce and the nursing home facility is a nice facility, I don't, I've never lived in a nursing home, by the grace of God. I'm 44, so that would be pretty early to be living in a facility. But Mr. Chamberlain voluntarily lives in a nursing home now. He resides at the VA nursing home in Anna. And so I don't know the conditions, and we can't guess outside of the record. We are bound by the record. There is no evidence that that facility was so horrible that, to create a lack of meaningful choice. Is it clear or unclear that when this agreement was signed, that he went through it with his attorney? He had an attorney. I get that. Yes. Where in the record does it establish he even talked to his attorney before signing? Nope. Or got advice? And this is one of those situations where I wish I had been the trial attorney, but I don't think the record is super clear. What the record is clear on is he had a lawyer in the Saline County case. Lynn had a lawyer in the Saline County case. Lynn's lawyer was drafting the document. Lynn's lawyer could not communicate directly with Mr. Chamberlain because of our rules of ethics to talk to someone who's represented, which leads a reasonable person to the conclusion she had to talk to Mr. Bradley, who was Gerald's attorney at the time. So does it say 100% in the record? Was Mr. Bradley brought in to testify? No. The only thing in the record about communication would be Mr. Chamberlain's self-serving statement that he didn't talk to his attorney. All right. Thank you. My question is apparently he had two strokes. Is that not correct? I believe he did have some strokes, yes. But, again, just because he was Okay. My question then is was it when he was in Texas, did he have had the second stroke before he went there? I think he may have had the second stroke in Texas. Actually, yeah. Are there any other questions before I continue? What was the nature, if we know, of his mental functioning after the second stroke? Do we know? There's no evidence that it was diminished. And I think in order for there to be a finding that he had diminished capacity, Mr. Chamberlain would have had to present evidence as such. The burden was not on Lynn to show that the agreement was valid. The burden was on him to show that it wasn't. So it was found procedurally unconscionable, not substantively unconscionable? No, it was found substantively, too. And let me get to that point as well. Okay. With regard to, it was found substantively unconscionable mainly because it was the house that was signed over to Lynn. And in Pruill, the wife received under the agreement out of a $3.8 million estate, she received $820,000. And Pruill says that a substantive unconscionability analysis requires that the contract be so unfair that the court cannot enforce it consistent with the interest of justice. But the court there also goes on to say just because an agreement is unfair doesn't mean that it's substantively unconscionable. The trial court focused more on what Gerald gave up and not on what Lynn brought to the equation. So if you, the valuation of the house was about, half of the valuation of the house is $78,000, which was awarded to Mr. Chamberlain. If you consider for a period of nine years him, in essence, paying Lynn that $78,000 for his interest in the marital residence, for care, he paid less than $10,000 a year for her to care for him. So if you think about Lynn, what she had to give up, working full-time, full-time employment, coming home, and helping care for her husband. Overnight, yes, she had assistance during the day because she was working full-time, but she was providing care for her husband and managing finances, making sure bills were paid, all at the tune of less than, actually less than $9,000 a year. Seems to me like a, actually a fair trade, a fair agreement. But the trial court disagreed, and mainly, I think it had to do with the fact that he was still in, he was in a nursing home. This agreement, by the way, I can't stress this enough, this agreement was Mr. Chamberlain's idea. It's not like, one of the things that Mr. Chamberlain, in his brief, relies upon is in-rated marriage of Richardson. In Richardson, that is completely distinguishable from this case. The husband in Richardson, he drafted, came up with this idea, this agreement, then he, the wife, had undergone some stress. Her, like, her father had been sick for a long period of time, and then the agreement was signed like a week after her father had died. And, but, before it was signed, wife took it to an attorney, and the attorney said, don't sign it. Don't sign that agreement. Husband went behind that attorney, used his corporate attorney to get another attorney who advised the wife to go ahead and sign it, and then she signed it. Like, the husband's actions in Richardson was just, like, disgusting to read as a family law practitioner. And in Richardson, you know, that court found, yeah, that agreement was unconscionable. Of course it was. The actions of the husband in that case made it unconscionable. We don't have that situation here. The appellate wants to focus on the fact that, you know, Gerald was under stress because he had had some health issues. Stress in and of itself doesn't equal duress. One thing I did want to focus on very briefly is Lynn's alleged violations. One of the things the trial court really, with all due respect to the trial court, really messed up was this idea that Mr. Chamberlain is obligated under the mortgage that she took out on the home in 2020. That's not valid at all. If you take a look at the record, when he signed the deed in 2012, that deed was not recorded until 2021. So when she took out that mortgage in 2020, he was still in the chain of title as ownership. If you take a look at the loan application that's in the record, and I can cite where it is in the record if you need me to, and the closing documents in the record, she's the only borrower. He signed the mortgage only, if you look at paragraph 20 of the mortgage, only as someone who's signing away their interest in the property if they have to foreclose. Not as someone who's obligated under the security interest, which was the biggest reason, one of the big reasons, why they deemed Lynn to have violated the agreement. My time isn't up quite yet. I have a question about the maintenance award. It didn't seem to me that there was any 504 analysis. And that's my argument. And actually, one of the basics of our profession, and correct me if I'm wrong, because you all are a little bit learned than I am, perhaps. Well, not perhaps, you are. In order to get something, you've got to ask for it, right? Like, I don't just get something just by being in your presence. I have to ask for it. None of the pleadings in this case asked for maintenance. The petition, no counterpetition, nobody asked for maintenance at all. And as you so correctly pointed out, there was no 504 analysis. And there was a double dipping on the house. So if you disagree with me and find that the trial court, you know, was correct about the unconscionable agreement, Judge Denny gave Mr. Chamberlain more than 50% of the value of the house. Because not only did he give him the $78,000 for the value, he gave him half of the $12,000 that my client took out in 2020. Without a dissipation claim, by the way, which should have been filed under Section 503. Say that again? Without a dissipation claim. Because it happened so far prior to the separation, and that money wasn't in an account somewhere. Like, if she had the $12,000 in an account, then he could divide the account. But that money was gone. So because the money is gone, in order for him to get it, there would have to be a notice to claim dissipation. There would have to be proof as to when the marriage underwent an irretrievable breakdown. And none of that happened in this case. Okay. Any other questions? Thank you, Ms. Campanella. You'll have some rebuttal time. Thank you. Mr. Asa. Mr. Asa. Thank you. Mr. Asa, what's the condition of your client now? I'm sorry? What is your client's condition? He has quadriplegia. Does he have any mental infirmities? Not that I know of, Your Honor. Did you have any trouble communicating with him? No, I had no trouble communicating with him, Your Honor. Okay. Good morning to this Court. Good morning. I'm William Asa. I'm Gerald Chamberlain's attorney. As the appellate began, this is a case about whether this prenuptial agreement is valid. And our position is, and I believe that the appellant agrees with the Court, found several reasons why this agreement was not valid. One, it was procedurally invalid. Two, it was substantively invalid. And three, if it was a valid agreement, Jeanette Chamberlain did not fulfill her agreements under the contract, and the Court would not enforce the agreement. And counsel cites, in Ray, the marriage of Prill, and I believe we are in a similar situation as Prill, except the shoe's on the other foot. As in Prill, essentially, Jeanette believes that her version of events are correct. However, the court, the appellate court rule, there's two versions here, and courts are tasked, trial courts are tasked with deciding who's telling the truth. And for everything that's in the record that Jeanette cites to, there's other evidence in the record that my client testified about. Where he was at. Did he talk to his lawyer? Did he have counsel at the time this happened? The record supports the finding that he did not. He testified. He did not. His lawyer was in Illinois. He did not talk to his lawyer when he was in Texas about this agreement. Well, if he didn't talk to his lawyer, who gave him counsel and advice? He just signed something that was presented to him? He talked to Jeanette. The testimony, he was calling her. He was talking to her. He was talking to her daughter. He wanted to go home. He'd had several strokes. Before he went to Texas, he had paraplegia. Eventually, he was determined to have quadriplegia, having interference with all of his extremities. When he... And there's nothing... Sorry. Mr. Asa, if you take Ms. Campanella's argument, do you think that the wife would have been entitled to some payment for the amount of time she contributed back into the marriage at night, taking care of him, cooking meals, for example, things of that nature? Your Honor, to me, that sounds like what a marriage is, is that a wife and two spouses take care of one another. Well, but in this particular case, one spouse was not able to care for himself. No, he was not. And he had, and the family had, the benefit of a lot of services that everyone just had. Right, but not at night. Well, there was testimony from the daughter that at night she would take care of him. And there was testimony that she also was paid. She would spend the night? Pardon? She would spend the night? She had said, yes, she had been there at night. And there was no testimony as to what kind of care was required at night, if any, other than, you know, manual task. I agree with the appellant. They have a big hurdle here. It's not just, well, you know, what happened in Texas, and was this agreement procedurally invalid? Well, if they get over that, then they have to address, was it substantively invalid? Was some combination of these two, procedurally and substantively, inconscionability claims or findings that the judge made, is that enough to throw it out? And then if they get over those two, then we get down to the trial court's ruling that even if it wasn't inconscionable, the contract's unenforceable because Jeanette did not perform under the contract. She did not keep Gerald informed about the finances. She did not buy that contract. She did not use her income to support the house. She was sweeping his income every month within days that his disability checks came in. She would take that money, sweep it into her account. He had no control. He was not told where the money went. When he asked about where the money went, the testimony was that she told him he can't afford to get a lawyer to find out about it. He said, well, let me talk to your lawyer. You can't afford to talk to my lawyer. She did not give him the information. She got this mortgage using her power of attorney. She didn't inform him about the mortgage. She didn't inform the mortgage company or the lender that Gerald had disclaimed his interest in the property through his quick home deed previously, which she had not recorded. She goes through this whole process to obtain money, and under that agreement that they had, if the prenuptial I'm sorry, postnuptial agreement is valid, any new obligation after the parties, after the postnuptial obligation, that was a joint debt. Now, did that bind him between the bank and her or him? No, because he didn't sign. He signed the mortgage, but he didn't sign the note. But it did bind him under the postnuptial agreement, because the postnuptial agreement in paragraph 13 says that any new debt that the parties acquire is a joint obligation. So she went out, using her power of attorney, obtained a new note on the house, and under that agreement, bound him by that agreement. Whose burden of proof was it? I'm sorry? Whose burden of proof was it on the issue of unconscionability? It was Mr. Chamberlain's. Mr. Chamberlain carried the burden, had the burden of proving that it was unconscionable? Yes, in the trial court, yes. Okay. What about this issue of maintenance, where the court didn't go through any of the 504 factors? There's nothing in the record showing that the courts went down that list of factors at one time and said, parties, here, I'm going to decide these things. But if we look in the record, almost every one of those factors, there's information in the record to address each of those factors. But isn't a court, before they award maintenance, supposed to go through and make findings as to those factors? Well, I'm sorry. As to, yes, but as to the maintenance, the award is a property settlement award. Right. The court did put in the nature of maintenance for bankruptcy purposes. It has that one little phrase that I've seen regularly, and I've attempted to address it in our brief, that that's to protect a party from, let's say, the court orders a property division, and then the other party, two months later, goes and files bankruptcy, and says, oh, I can't pay this. And the debt's discharged because it's a property settlement, not in the nature of maintenance. I may agree with you on the impact of that, but we have a statute that's supposed to be complied with in making an award of maintenance, and I didn't see that that happened. So if it's not maintenance, then it's a property settlement. But the court awarded maintenance. The court specifically said that this amount is maintenance. It's being awarded as maintenance. Right? In the nature of maintenance. I believe the court's order was. Sorry. Maintenance to genetics denied, the property awarded to Gerald L. Chairman shall be deemed in the nature of maintenance and not discharged for bankruptcy. That's the only, those are the only two times that maintenance is mentioned in that order. Right. What are we supposed to do with that? Well, as far as genetics is concerned, maintenance is denied, so that's the easy one. This one, it says the property awarded to Gerald. I don't think there's a question as to, I think that the property division, just looking at the property award, the amount of the property award is well within reason, given the nature of the estate. And within the extra part, it says shall be deemed in the nature of maintenance and not discharged in bankruptcy. If the court finds that this is not maintenance, or deemed in the nature of maintenance, it says it's deemed in the nature of maintenance. That's hard language to, I don't know exactly what that, it doesn't mean that this is maintenance or deemed in the nature for bankruptcy purposes, which then also requires a fine in my bankruptcy court if that happens. I think this is kind of prophylactic language that was, the court inserted. I don't believe that, you know, this is not in the traditional, there weren't the specific findings going through the statute for factors for maintenance. However, I do think that there is sufficient evidence to support findings under those. So as to the managing, I'm sorry. As to the argument of dissipation, Your Honor, there was no finding of claims of dissipation here. The judge in dividing up the property also found that Jeanette had a 401K that was at least worth $12,000 some odd. It's hard to tell because she didn't comply with discovery, and she changed her answers as going along through the hearing. But there was at least $12,000 that she had in a 401K that was awarded to her in total. This other money that she had got when she mortgaged the property in 2020, incurring the debt under the post-nuptial agreement for Mr. Chamberlain, she took out $12,000. The judge said he gets half of that value. She got cashed that out. She couldn't account for where the money went. It wasn't, there's nothing showing that it went to her or to him. The judge said, looking at the whole picture, he gets half of the value of the house. He gets $6,000 some odd, and she gets almost everything else. All the personal property. Even the personal property that the post-nuptial agreement would have awarded to him, she ended up with. I believe that the court here in order to, I believe there's sufficient evidence in the record to affirm the child court's finding on several grounds, and it doesn't have to be on every ground. It can be on the ground that there's procedural unconscionability in the contract was entered into. There's the ground that when you look at the agreement itself, it's completely one-sided. What did Jeanette provide in addition to what any person in a spousal relationship would have provided? And then if it is, if it's not unconscionable, then you get to the contract issue. Is it enforceable? The judge found no. Jeanette did not abide by the terms of the agreement, and the court's not going to enforce it. And so I think they have to attack each one of those and be successful on every one of those. And as to the maintenance, if this court finds that there was, it's not in, it's not deemed in the nature of maintenance, then what is left? It's deemed, it's a property settlement. That's what the statement begins with, that his property settlement. And if there's a bankruptcy proceeding, that's a whole different issue that has to be brought up before the bankruptcy court. Thank you, Your Honor. Any further questions? No questions. Thank you. Thank you very much. Ms. Campanello? Thank you, Justices. So for my rebuttal, I want to focus on Lynn's alleged violations of this agreement. If you take a look in the record at E357, it has the paragraphs that the judge cites that she violated. The appellee focused on the mortgage. It's a violation of paragraph 13, which says, 13 of the agreement, which says, any debtor won't obtain after the execution of this agreement shall be considered as joint debt with liability resting on both parties. That does not create a burden to Lynn to not incur debt. However, I would argue that the mortgage is not a joint debt under this agreement based on paragraph 12A. 12A on that same page says, quote, Jeannette keeps the residence located at, it's got the address in Stoneport, Illinois, and will be responsible for all of the financial matters associated with said property. Last that I checked, a mortgage is a financial matter associated with real property. So the debt that she incurred, the mortgage that she took out in 2020, in fact, would be a debt that she would have to pay. And the only reason why his signature is on the mortgage, it's not on any note securing this debt. Not one thing. If you look in the record, the only thing that secures the debt has got Lynn's signature on it. The only reason why he had to sign it is because Lynn, who's not, who didn't come up with this concocted scheme to get the house away from Gerald, because if she had, before the ink was dry, in October of 2012, when he signed that deed, she would have ran to the Saline County clerk's office and recorded it. She didn't. She recorded it in 2021. So when she took out a mortgage in 2020, of course he had to sign the mortgage, but only as someone who had an interest in the property. With regard to her violation, alleged violation of the financial matters not keeping him up to date, if you take a look at paragraph 14 in the agreement, paragraph 14 says that she's responsible for handling all financial matters of the parties and will keep Gerald informed of the same. Handling all financial matters of the parties. Sounds to me like nothing in that requires her to keep their finances separate. Sounds to me like she does have the authority to transfer his income over and pay all of their bills, and if she didn't pay all of their bills, then she's in violation of that paragraph. But it doesn't say how is he to be reasonably informed. How's he to be informed? Is it every day? Is it every week? Is it every month? Is it every year? Sounds to me there was testimony he was informed. Hey, I want this. You can't afford it. Sounds like he's being informed about his finances. With regard to the, you know, the, if you take a look at paragraph 13 and 15 in the agreement, none of those place a burden on anyone. So I'm not exactly sure how the trial court found that there was a violation of those. And I would reiterate, or I would ask the court to consider entering the marriage of Frye, which I cited in my brief, about the division of the house. So, again, let's say you completely disagree with the appellant about whether or not this agreement is unconscionable, and you find that it's unconscionable and not enforceable. Mr. Chamberlain's not entitled to $78,000 plus $6,000. He'd be entitled to $58,000. I arrived at that by dividing the equity in the property. Frye stands for the proposition that equity is what's to be divided. There's a $40,000 mortgage. So you take the value that the court found, which I think is a fair value, subtract $40,000 and divide that. So I think it mostly would be entitled to would be $58,000, and not as maintenance. So I think the, we would ask the court to reverse the trial court's findings in this case. And with regard to maintenance, if Your Honors wanted to reverse it more man for finding, I think that would be reasonable. Thank you for your time. Thank you. Questions? No questions. Sorry, I went a little prematurely. It's all right. No. Thank you, Ms. Campione. Thank you. All right. Thank you both for your arguments here today. 523-0288, Chamberlain v. Chamberlain will be taken under advisement.